UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| ROBIN WALLACE, | ) |
| Plaintiff, | ) ) |
| | ) Civil No. 3:14-01976 |
| v. | ) Judge Sharp |
| | ) |
| HENDERSONVILLE HOSPITAL CORPORATION, | ) ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM

Plaintiff Robin Wallace brings two claims against Defendant Hendersonville Hospital Corporation ("HHC") under Title VII of the Civil Rights Act ("Title VII"), 42 U.S.C. § 2000e. (Docket No. 1.) Wallace alleges that (1) he was fired because of his sex and that (2) he faced improper retaliation for disciplining a subordinate. HHC has moved for summary judgment on both claims. (Docket Nos. 24, 25.) The Court will GRANT HHC's motion.

## BACKGROUND

The following facts are undisputed.

TriStar Hendersonville Medical Center ("THMC") is a hospital in Hendersonville, Tennessee, and is owned and operated by HHC. Robin Wallace is a Registered Nurse who lives in Tennessee.

Wallace began working at THMC in January 2012. He was hired as a "super-pool" nurse, a position created at Wallace's suggestion. Super-pool nurses work in different hospital units on different days, depending on where nurses are needed. He stayed in that position for about a year. (Docket No. 29, pp. 1–2.)

1

In February 2013, Wallace was promoted to House Supervisor, a position that put him "in charge of the whole hospital at night." (Docket No. 25-1, p. 14.) In that role, he oversaw five charge nurses (one in each unit), and all of the regular nurses. He also supervised the janitors, secretaries, and other administrative staffers who worked during his shifts. (Docket No. 25-1, pp. 14–16.)

In September 2013, two nurses—Heather Tate and Jessica Beckham—told Jennifer Ruby, the Director of Medical and Surgical Services at THMC, that Wallace had acted inappropriately during their shifts. (Docket No. 25-3, pp. 3–4; No. 29, p. 2.) Ruby felt that the allegations were serious, so she forwarded the complaints to Jennifer Burden, Vice President of Human Resources, for investigation. (Docket No. 29, p. 2.)

Burden interviewed Tate and Beckham. Both women told her that Wallace had touched them inappropriately and made sexual comments during their shifts. Beckham said that Wallace had told her that she looked cute when she was flustered and that he "bet [she] gets flustered in bed." (Docket No. 25-3, p. 8.) She also said that Wallace had touched her hair without permission, telling her that it was "pretty and long." (Docket No. 25-5, p. 8.) Tate's complaints were similar to Beckham's. She said that Wallace had told her that she had "a very sexy neck." (Docket No. 25-5, p. 8.)

Both women found Wallace's behavior unsettling. Beckham said that it bothered her that he abused his leadership role by making others feel uncomfortable. Tate was more succinct, telling Burden that "[Wallace] creeps me out." (Docket No. 25-5, p. 8.)

After she interviewed Tate and Beckham, Burden reported her findings to Lisa Gann, Chief Nursing Officer at THMC. (Docket No. 29, p. 2.) Burden told Gann that Wallace's comments "were disturbing" and that the allegations were serious enough to discipline Wallace.

2

(Docket No. 25-5, p. 4.) Still, she felt that Wallace "need[ed] to be given one shot to turn it around." (Docket No. 25-5, p. 4.) Gann agreed. (Docket No. 29, p. 2.) On September 8, 2013, she gave Wallace a formal written warning, which stated that Wallace's comments were "unacceptable" and cautioned that future misconduct would be "grounds for immediate termination." (Docket No. 25-5, p. 5.)

Two months passed. Then, on November 14, 2013, an anonymous employee called THMC's Ethics and Compliance Hotline to complain about Wallace. The caller said that Wallace had continued to make sexual comments toward Beckham and another employee, even after his formal warning in September. (Docket No. 25-6, p. 6.) The caller also said that nurses were intimidated by Wallace and feared retaliation from him, and that, in general, Wallace "created a negative working environment" during his shifts. (Docket No. 25-6, p. 2.) In light of Wallace's history of sexual misconduct, THMC managers found the caller's allegations troubling. They launched a full investigation into Wallace's behavior, led by Kim Sutton, an Ethics and Compliance officer at THMC. (Docket No. 25-6, p. 1.)

Sutton began by interviewing employees about Wallace's behavior at work. At least five of those employees corroborated the anonymous caller's allegations:

1. Fallin Gautz, a respiratory therapist on the night shift, said that Wallace regularly told vulgar jokes and discussed his sexual preferences at work. (Docket No. 25-6, pp. 2, 19.) Gautz was one of several employees who told Sutton that Wallace had circulated a photograph of himself wearing a revealing thong-style bathing suit.[1]

2. April Huffines, another respiratory therapist who worked on the night shift, said that Wallace often made inappropriate comments toward women and "looked at women's bodies instead of their faces" when speaking with them. (Docket No. 25-6, p. 3.) She told Sutton that "she would not be comfortable in a small space alone with him." (Docket No. 25-6, p. 3.)

---

[1] The photograph was apparently well known at THMC. In her declaration, Sutton said that "[d]uring the course of [her] investigation, someone slipped a copy of the picture of Wallace in his speedo under [her] door." (Docket No. 25-6, p. 2.) A full-size copy of the photo is attached to Sutton's declaration. (Docket No. 25-6, p. 81.)

3

3. Claire Campbell, a registered radiologic technologist on the night shift, said that Wallace had tried to engage her in sexual conversations when they first began working together. Campbell said that, after her first interactions with Wallace, she had tried to avoid talking with him. (Docket No. 25-6, pp. 2–3.)

4. Monica Decker was the Assistant Director of Medical and Surgical Services at THMC and worked on the night shift. Decker said that Wallace "was always on a power trip" and tended to "buck[] [the] system." (Docket No. 25-6, p. 3.) Decker also said that Wallace was needlessly hostile and aggressive at work. She, too, tried to avoid him. (Docket No. 25-6, p. 3.)

5. Torris Crayton, a respiratory therapist on the night shift, told Sutton that Wallace had told him to avoid the third floor—where Beckham worked—because "[t]hose bitches will report you." (Docket No. 25-6, p. 2.)

Sutton later stated that she "believed the [employees whom she interviewed] were truthful" and that she "had no reason to believe they would fabricate complaints concerning Wallace." (Docket No. 25-6, p. 3.)

Sutton compiled her findings a written report, which she presented to Gann on December 5, 2013. (Docket No. 25-6, pp. 16–81.) In the report's summary, Sutton wrote that "the allegations presented in the [November 14, 2013] Ethics call should be considered as substantiated." (Docket No. 25-6, p. 14.)

Gann was alarmed. As she stated in her declaration, the report showed that Wallace had continued to act inappropriately toward other employees, despite receiving a written warning based on the exact same type of conduct only three months earlier. (Docket No. 25-2, p. 2; No. 25-5, p. 2; No. 29, p. 4.) She "believed the allegations to be serious, believed the allegations to be truthful, and believed that Wallace had . . . violated the Hospital's sexual harassment policy and Code of Conduct." (Docket No. 25-5, p. 2.)

Gann decided to fire Wallace. (Docket No. 29, p. 4.) His termination was effective on December 12, 2013. (Docket No. 25-2, p. 2.)

4

Wallace appealed the decision internally, appearing in front of THMC's Peer Review Panel and arguing that the complaints were "false allegations." (Docket No. 25-1, p. 41; No. 25-6, p. 78; No., 29, p. 4.) The Peer Review Panel upheld Gann's decision. (Docket No. 25-1, p. 42.)

Wallace filed this suit on October 14, 2014. (Docket No. 1.)

## LEGAL STANDARD

Summary judgment "is appropriate only where 'the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.' " Whitfield v. Tennessee, 639 F.3d 253, 258 (6th Cir. 2011) (quoting FED. R. CIV. P. 56(c)). A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). A court's function at the summary-judgment stage is simply to "determine whether there is a genuine issue for trial." Id. at 249. In doing so, a court must draw "all reasonable inferences in favor of the nonmoving party." Shreve v. Franklin Cty., Ohio, 743 F.3d 126, 132 (6th Cir. 2014). See also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## ANALYSIS

### I. Title VII Discrimination Claim

The elements for a Title VII gender-discrimination claim are well established. To make out a prima facie case, Walker must show that 1) he was a member of a protected group; 2) he was subjected to an adverse employment action; 3) he was qualified for his position; and 4) similarly-situated non-protected employees were treated more favorably. Peltier v. United States, 388 F.3d 984, 987 (6th Cir. 2004).

5

If Wallace can make out a prima facie case for the violation, the burden shifts to HHC to articulate a nondiscriminatory reason for the adverse action. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–04 (1973); White v. Columbus Metro. Hous. Auth., 429 U.S. 232, 240 (6th Cir. 2005). If HHC offers such a reason, the burden then shifts back to Wallace to prove that HHC's explanations are pretextual. Id.

HHC concedes that Wallace satisfies the first, second, and third elements—that he was a member of a protected class, that his firing was an adverse employment action, and that he was qualified for his position as House Supervisor. (Docket No. 25, p. 8, n.3.) But HHC argues that Wallace has failed to make out the fourth element of his prima facie case—that THMC treated similarly-situated women differently from him. The Court agrees.

A plaintiff may prove the fourth element of a gender-discrimination claim by showing "that a comparable non-protected person was treated better" than he was. Jackson v. Int'l Fiber Corp., 381 Fed. App'x 275, 280 (6th Cir. 2010) (internal quotation marks omitted). To be "comparable," a comparator must be similar to a plaintiff "in all of the relevant aspects." Martin v. Toledo Cardiology Consultants, Inc., 548 F.3d 405, 412 (6th Cir. 2008); Clayton, 281 F.3d at 610; Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 352 (6th Cir. 1998). Specifically, a plaintiff would need to show that each comparator "dealt with the same supervisor, [was] subject to the same standards, and ha[s] engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (6th Cir. 1992). And a plaintiff would need to show that each comparator's misconduct was "similar in kind and severity" to his own. Johnson v. Interstate Brands Corp., 351 Fed. App'x 36, 40 (6th Cir. 2009).

6

Wallace tried to make this showing. In his deposition testimony, he pointed to six other employees at THMC who were not fired after they engaged in inappropriate sexual misconduct at work: (1) Beckham; (2) Crayton; (3) Decker; (4) Jennifer Sandvitis, an ICU nurse; (5) Heather Walker, a staff nurse; and (6) a telemetry technician named Tim.[2] According to Wallace, each of those employees acted inappropriately during their shifts at THMC. Crayton was "giving people massages at the hospital," while Tim would "talk about his sex life" and "look at the nurses and say, 'Ooh, you look good,' and stuff like that." (Docket No. 25-1, pp. 35–37.) Sandvitis posed suggestively for photos and pantomimed a sex act with a training mannequin. Walker talked about her sex life, Decker told her coworkers that she did not wear underwear, and Beckham "pretty much proposition[ed]" Wallace during his shift. (Docket No. 25-1, pp. 27, 29–32, 54.)

But Wallace has not shown that any of those six were "similarly-situated, non-protected" employees. Clayton v. Meijer, 281 F.3d 605, 610 (6th Cir. 2002). For one thing, two of his purported comparators—Crayton and Tim—are men. As a result, both are outside of the non-protected class of employees—women—that Wallace argues received preferential treatment at THMC. And a plaintiff may point only to non-protected employees as comparators in making a prima facie case of gender discrimination. See, e.g., Sperber v. Nicholson, 342 F. App'x 131, 132 (6th Cir. 2009) (granting summary judgment to employer after finding that plaintiff's purported comparator was a member of the protected class); Lester v. Logan's Roadhouse, Inc., 2014 WL 346719, at *8 (W.D. Tenn. Jan. 30, 2014) (granting summary judgment to employer after finding that purported comparator was a member of the protected class). See also Jordan v. City of Gary, 396 F.3d 396 F.3d 825, 833 (7th Cir. 2005) ("[B]ecause [comparator] is a member of the same protected class as [the plaintiff], [the plaintiff] is precluded from successfully arguing that she was unfairly discriminated against."); Floyd v. U.S. Dep't of Homeland Sec.,

---

[2] Wallace could not recall Tim's last name, but "want[ed] to say it's 'McNamara.'" (Docket No. 25-1, p. 37.)

7

2009 WL 3614839, at *8 (D. Md. Oct. 27, 2009) ("A plaintiff cannot establish a claim of disparate treatment by referencing a comparator of the same protected class.").

Wallace also fails to show that any of the four women were similarly situated. Beckham, Sandvitis, and Walker were all staff nurses at THMC, and none had any supervisory responsibility—unlike Wallace, who was "in charge of the whole hospital at night." (Docket No. 25-1, pp. 4, 13, 23–25, 28, 46.) And since "supervisory and non-supervisory employees [are] not . . . similarly situated," Wallace cannot rely on any of those three as comparators in his gender-discrimination claim. Rutherford v. Britthaven, Inc., 452 Fed. App'x 667, 672 (6th Cir. 2011). See also, e.g., White v. Duke Energy-Ky., Inc., 603 Fed. App'x 442, 452 (6th Cir. 2015) (Griffin, J. dissenting) ("[S]upervisory and non-supervisory personnel are not similarly situated."); Martinez v. Cracker Barrel Old Country Store, Inc., 703 F.3d 911, 917 (6th Cir. 2013) ("[The plaintiff's] role as a manager at Cracker Barrel could reasonably justify holding her to a more stringent standard of conduct than [an assistant manager]."); Quinn-Hunt v. Bennett Enters., Inc., 211 Fed. App'x 452, 459 (6th Cir. 2006) ("[The comparator] is a supervisory employee, and [the plaintiff] is not. . . . This weighs against a finding that they are similarly situated.").

This leaves only Decker. In his deposition, Wallace testified that Decker told other employees that she no longer wore underwear. (Docket No. 25-2, pp. 30–32.) Wallace said that he told her to "be aware of what [she was] saying" at work, and to "just watch what [she] sa[id]." (Docket No. 25-1, pp. 119, 121.) Wallace also testified that he told his supervisors about his conversation with Decker, but she was never disciplined. (Docket No. 25-1, pp. 119, 121.)

Yet Wallace has not shown that Decker's comments were "similar in kind" to his own misconduct. See Johnson, 351 Fed. App'x at 40. The Sixth Circuit has held that a comparator's

8

conduct is "similar" only if it was at least as egregious as the plaintiff's conduct. Barry v. Noble Metal Processing, Inc., 276 Fed. App'x 477, 483 (6th Cir. 2008); see also Simpson v. Vanderbilt Univ., 359 Fed. App'x 562, 569 (6th Cir. 2009); Clayton, 281 F.3d at 611–12 ("[An] employer's more severe treatment of more egregious circumstances simply cannot give rise to an inference which would support the establishment of a prima facie case of discrimination.").

Wallace's conduct was far more egregious than Decker's. Decker only made one inappropriate comment: During a conversation about a coworker's pregnancy, Decker recalled that, during her own pregnancy, she been more comfortable without underwear. Wallace, on the other hand, touched one coworker's breast, told another coworker that she had a "sexy neck," referred to women at THMC as "bitches," and circulated a photograph of himself in a revealing bathing suit. (Docket No. 25-6, pp. 2, 19.) One woman said that Wallace had stroked her hair without permission, and another said that Wallace said that he "bet[] [she] get[s] flustered in bed." (25-7, p. 1.) Any of these incidents, taken alone, is far more egregious than Decker's fleeting remark about underwear, so it was not unreasonable—and certainly not discriminatory—for Wallace's supervisors to discipline him more harshly than Decker.

And though Decker had never acted inappropriately before, Wallace had a well-documented history of sexually-inappropriate behavior at THMC. (Docket No. 25-6, pp. 1–3.) Courts in the Sixth Circuit have held that two employees are not similarly situated when the employees have different disciplinary histories from one another. Rutherford, 452 Fed. App'x at 672; Campbell v. Hamilton Cty., 23 Fed. App'x 318, 325 (6th Cir. 2001); Barber v. Hamilton Cty. Dep't of Educ., 2010 WL 1708472, at *4 (E.D. Tenn. Apr. 27, 2010) (finding that plaintiff and comparator were not similarly situated when plaintiff was involved in misconduct several times, but comparator had been involved only once). By the time that he was fired, Wallace had

9

already received a written warning for harassing Tate and Beckham in September 2013. (Docket No. 25-7, p. 2.) Indeed, Wallace was fired in December 2013 because it was his second serious offense in a two month span: Gann stated that "the reason [she] made the decision to terminate [Wallace's] employment" was that he had continued to "engage in inappropriate conduct . . . despite [the] prior Written Warning." (Docket No. 25-5, p. 2.)

Wallace has not presented any similarly-situated non-protected employees who were treated more favorably than he was. Thus, he has failed to show a genuine issue of fact on the fourth element of his Title VII sex-discrimination claim. HHC is entitled to summary judgment on that claim.[3]

## II. Title VII Retaliation Claim

Title VII's anti-retaliation provision makes it unlawful for an employer to discriminate against an employee "because he has opposed any practice made an unlawful employment practice . . . , or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" related to an unlawful employment practice. 42 U.S.C. § 2000e-3(a). To make out a prima facie case for retaliation under Title VII, Wallace must show that (1) he engaged in a protected activity; (2) HHC knew about his protected activity; (3) HHC took materially-adverse action against him after his protected activity; and (4) there was a causal connection between the activity and the materially-adverse action. Burlington N. & Santa Fe Ry. Co., 548 U.S. at 67–68 (2006); Morris v. Oldham Cty. Fiscal Ct., 201 F.3d 784, 792 (6th Cir. 2000). As with his Title VII discrimination claim, Wallace bears the initial

---

[3] The Court also notes that, in response to HHC's summary-judgment motion, Wallace tries to support his discrimination claim by alleging that he was replaced by a woman after being fired. (Docket No. 28, p. 8–9.) Wallace never mentioned anything about his replacement in his complaint, nor did he offer any testimony on his replacement during his deposition. Since a party "may not seek to expand its claims to assert new theories . . . in response to summary judgment," Bridgeport Music, Inc., v. VM Music Corporation, 508 F.3d 394, 400 (6th Cir. 2007), the Court will not address Wallace's new argument.

10

burden for his retaliation claim. Fuhr v. Hazel Park Sch. Dist., 710 F.3d 668, 674–75 (6th Cir. 2013) (citing McDonnell Douglas, 411 U.S. at 802–04).

Wallace claims that, after he reprimanded Walker for being insubordinate in front of patients, she made an anonymous call to THMC's Ethics and Compliance Hotline and claimed that Wallace had harassed her. (Docket No. 1, p. 2; No. 25-1, pp. 5, 38.)[4] But HHC argues that Wallace never engaged in protected activity when he chastised Walker for insubordination in 2013. (Docket No. 25, pp. 23, 24–25.) Because "[m]erely . . . performing one's job is not a protected activity under Title VII," HHC contends, Wallace has failed to make out a prima facie case for retaliation. (Docket No. 25, p. 23.) The Court agrees with HHC.

Disciplining Walker was not "protected activity" under Title VII. When Wallace spoke with Walker, he was responding to her inappropriate outburst in a patient's room a few minutes earlier. (Docket No. 25-1, p. 5.)[5] But in doing so, Wallace was not reacting to any perceived discriminatory conduct, as Title VII requires. See Ross v. Fluid Routing Solutions, Inc., 2014 WL 2168168, at *12 (E.D. Tenn. May 23, 2014), aff'd, 605 Fed. App'x 544 (6th Cir. 2015) ("Because Plaintiff has not shown that in these instances she was acting in opposition to what she reasonably perceived to be unlawful discrimination, she cannot rely on them as a basis for her retaliation claim."). Instead, he was simply trying to discipline a staff nurse. And simply disciplining a subordinate is not enough to constitute a "protected activity" under Title VII. See Williams v. Cty. of Fairfax, 1998 WL 708694, at *2 (4th Cir. Sept. 24, 1998) ("[A]ttempting to discipline a subordinate is not a 'protected activity' under Title VII.").

---

[4] Wallace admits that he "ha[s] no idea" who made the anonymous call, but he "would assume it was Heather Walker." (Docket No. 25-1, p. 38.)
[5] He testified that reprimanded her because "we're not going to have a shouting match in front of the patients[.] [T]hat's not appropriate." (Docket No. 25-1, p. 5.)

11

Moreover, Wallace has made no effort to carry his summary-judgment burden on his retaliation claim. His response is bereft of any applicable law or citations to relevant parts of the record—in fact, his brief never even mentions the claim. (See Docket No. 28.) This failure alone would entitle HHC to summary judgment. Stansberry v. Air Wisc. Airlines Corp., 651 F.3d 482, 486 (6th Cir. 2011) ("When a motion for summary judgment is properly made and supported and the nonmoving party fails to respond with a showing sufficient to establish an essential element of its case, summary judgment is appropriate."); Jones v. Williamson Cty. Bd. of Educ., 2015 WL 751993, at *13 (M.D. Tenn. Feb. 23, 2015) ("The plaintiff's failure to address either of these arguments in her response in opposition to the motion for summary judgment constitutes a waiver of any argument she might have.").

Wallace failed to make out a prima facie case for a retaliation claim, then offered nothing to rebut HHC's summary judgment motion. Accordingly, HHC is entitled to summary judgment on that claim.

## CONCLUSION

For the foregoing reasons, the Court GRANTS HHC's motion for summary judgment. An appropriate Order will be entered.

_____
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE